# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CHRISTOPHER P. TEACHER,

> Plaintiff,

> v.

TROY MEINK,[1]
*in his official capacity as*
*Secretary of the Air Force,*

> Defendant.

Civil Action No. 24-3325-TDC

## MEMORANDUM OPINION

Plaintiff Christopher P. Teacher, a former United States Air Force servicemember, has filed this civil action against the Secretary of the Air Force ("the Air Force") in which he challenges the denial by the Air Force Board for Correction of Military Records ("AFBCMR") of Teacher's application to remove a disciplinary action and demotion from his military records. In the Complaint, Teacher alleges that the AFBCMR's denial of his application violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. Teacher has filed a Motion for Judgment on the Administrative Record, and the Air Force has filed a Cross Motion for Summary Judgment, which are fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. D. Md. Local R. 105.6. For the reasons set forth below, Teacher's Motion will be DENIED, and the Air Force's Motion will be GRANTED.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Air Force Troy Meink is substituted in place of former Secretary of the Air Force Frank Kendall, III.

## BACKGROUND

### I. Statutory and Regulatory Regime

#### A. Article 15

The Uniform Code of Military Justice ("UCMJ"), which governs servicemembers in the armed forces of the United States, "provides four methods for disposing of cases involving offenses committed by service[members]: the general, special, and summary courts-martial, and disciplinary punishment administered by the commanding officer." *Middendorf v. Henry*, 425 U.S. 25, 31 (1976). The last of these methods proceeds pursuant to Article 15 of the UCMJ, under which "any commanding officer may, in addition to or in lieu of admonition or reprimand, impose . . . disciplinary punishments for minor offenses without the intervention of a court-martial." 10 U.S.C. § 815(b). Such a disciplinary proceeding is known as an Article 15 proceeding or a "non-judicial punishment" ("NJP"). *Id.* § 815. Any servicemember not serving on a vessel has the right to request a court-martial instead of an Article 15 proceeding. *Id.* § 815(a).

As relevant here, the UCMJ grants to the President and to the Secretary of the Air Force the authority to prescribe regulations governing Article 15 proceedings. *Id.* Pursuant to this authority, the Air Force has issued Air Force Instruction ("AFI") 51-202, the 2019 version of which was in effect at the time of the relevant events. *See* AFI 51-202, Nonjudicial Punishment (Mar. 6, 2019), Air Force Mot. Ex. 2, ECF No. 28-3 ("AFI-202"), *superseded by* AFI 51-202, Nonjudicial Punishment (Jan. 4, 2022). Upon receipt of notice that a commander of an Air Force unit is pursuing an Article 15 proceeding, a servicemember has three days to accept such a proceeding or to reject it and request a court-martial. AFI 51-202 ¶ 3.11.

Unlike a court-martial, an Article 15 proceeding does not follow formal rules of evidence and does not require proof beyond a reasonable doubt. *Compare* 10 U.S.C. §§ 836(a), 851(c) *with*

2

AFI 51-202 ¶¶ 3.1, 3.4. Rather, a "commander who initiates NJP action and imposes punishment acts on the basis of information the commander determines relevant." AFI 51-202 ¶ 3.1. Pursuant to version of AFI 51-202 in effect at the time of the relevant events, "[n]o specific standard of proof applies to NJP proceedings, including appeals," but commanders are cautioned that because "a member is entitled to demand trial by court-martial, in which case proof beyond a reasonable doubt of each element of every offense by legal and competent evidence is a prerequisite to conviction," "[w]hether such proof is available should be considered before initiating" an Article 15 proceeding and "[i]f such proof is lacking, NJP action is usually not advisable." *Id.* ¶ 3.4. After "full and fair consideration of the evidence, including any matters presented by the member," the commander must either determine that the servicemember committed an offense and impose a punishment, or else terminate the proceedings because the servicemember "did not commit the offense(s) alleged" or because "NJP is not appropriate*." Id.* ¶¶ 3.13–3.14.

An Article 15 proceeding is less formal than a court-martial, but members of the armed forces nevertheless have certain procedural rights. For example, servicemembers have the right to the assistance of counsel during the proceeding and the "right to consult a lawyer before making any decisions," *id.* ¶ 3.11.2, the "right to examine all statements and other evidence that the commander has examined and intends to rely upon" in the Article 15 proceeding*, id.* ¶ 3.5, and in most cases the right to "appear personally before the imposing commander and present matters in defense, mitigation, or extenuation," *id.* ¶ 3.12. While the available procedural rights are more limited in an Article 15 proceeding than in a court-martial, the available punishments are also more limited. *See Middendorf*, 425 U.S. at 31–32 & n.9 (stating that a general court-martial is akin to a "judicial proceeding[]" in which "any lawful sentence, including death" may be imposed, but that an Article 15 proceeding is an "informal nonjudicial disposition" and "an administrative method

of dealing with the most minor offenses"). Specifically, Article 15 proceedings may result in punishments including a maximum of 30 days in correctional custody, the forfeiture of one month of pay, the imposition of certain restrictions for up to 60 days, the imposition of certain extra duties for up to 45 days, and a reduction in an enlisted servicemember's rank. *See* 10 U.S.C. § 815(b); AFI 51-202 ¶ 3.16, tbls. 3.1 & 3.2.

After punishment is imposed on a servicemember in an Article 15 proceeding, the servicemember has the right to appeal within five days on the grounds that "the offense was not committed" or "the punishment [is] unjust or disproportionate to the offense." AFI 51-202 ¶¶ 4.1, 4.5.2. An appeal is first reviewed by the commander who imposed the punishment, who may "suspend, mitigate, remit, or set aside the punishment," and is then considered by the "next superior authority," normally the imposing commander's commanding officer, who may grant or deny relief "by using the same power as may be exercised by the imposing commander to suspend, mitigate, remit, or set aside the punishment." *Id.* ¶¶ 4.2, 4.6–4.7. If relief is denied on appeal, the servicemember may apply to the AFBCMR for a correction of military records. *See* 32 C.F.R. § 865.3(a)(1).

### B.    AFBCMR

By statute, each "Secretary of a military department," including the Secretary of the Air Force, "may correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Such corrections "shall be made by the Secretary acting through boards of civilians of the executive part of that military department" and "shall be made under procedures established by the Secretary." *Id.* § 1552(a)(1), (3). Exercising this authority, the Air Force established the AFBCMR by regulation. *See* 32 C.F.R. §§ 865.0–865.8; *see also* AFI 36-2603, Air Force Board for Correction of Military Records (Sept. 18, 2017),

4

*superseded by* AFI 36-2603, Air Force Board for Correction of Military Records (Oct. 4, 2022). The AFBCMR, which operates within the Office of the Secretary of the Air Force, "considers all individual applications properly brought before it," and "[i]n appropriate cases, it directs correction of military records to remove an error or injustice, or recommends such correction." 32 C.F.R. §§ 865.1–865.2.

The applicant bears "the burden or providing sufficient evidence of material error or injustice." *Id.* § 865.4(a). The AFBCMR "normally decides cases on the evidence of the record," but it "may, in its discretion, hold a hearing or call for additional evidence or opinions in any case." *Id.* § 865.2(c). Such additional information and opinions may include "advisory opinions on an application from any Air Force organization or official." *Id.* § 865.4(a)(1). The applicant is afforded the opportunity to review and comment on any such advisory opinions but does not have the right to a hearing, which is held in the AFBCMR's discretion. *Id.* § 865.4(b), (f).

The AFBCMR determines by majority vote "[w]hether the applicant has demonstrated the existence of a material error or injustice that can be remedied effectively through correction of the applicant's military record and, if so, what corrections are needed to provide full and effective relief." *Id.* § 865.4(h)(4). The grant or denial of an application, or its referral to the Secretary for a final decision, constitutes a final action by the AFBCMR. *Id.* §§ 865.4(*l*), 865.5(a).

## II.    The Air Force Investigation

Teacher began his service in the Air Force on November 23, 1999 and served in the Air Force Reserve from 2000 forward. By the time of the relevant events, Teacher had attained the rank of Master Sergeant. On July 23, 2019, he deployed to Ali Al Salem Air Base in Kuwait and began serving as a Noncommissioned Officer in Charge for the 386th Expeditionary Logistics Readiness Squadron, a role in which he oversaw approximately 40 subordinates in the Ramp

Operations Section. On September 9, 2019, Teacher instituted a new policy of issuing Letters of Reprimand when servicemembers "cause a plane to delay, forget to load cargo, or load the wrong cargo." Administrative Record ("A.R.") 45, ECF Nos. 20-1 to 20-2, 23-1 to 23-4.

On September 23, 2019, three female servicemembers filed complaints alleging that Teacher had engaged in inappropriate behavior dating back to early August 2019. On September 25, 2019, Teacher's commanding officer, Lieutenant Colonel Melissa R. Thurman, initiated a Commander Directed Investigation into the complaints against Teacher. That same day, Teacher was removed from his supervisory position based on these complaints.

Specifically, Lt. Col. Thurman directed an Investigating Officer to investigate, in relation to the period between August 1 and September 23, 2019, whether Teacher engaged in "sexual or other unlawful harassment," in violation of Department of Defense Instruction ("DODI") 1020.03, Harassment Prevention and Response in the Armed Forces ¶¶ 3.1, 3.3 (Feb. 8, 2018), and whether Teacher "maltreat[ed]" his subordinates by subjecting them to discriminatory comments, in violation of Article 93 of the UCMJ, 10 U.S.C. § 893. A.R. 175. At that time, DODI 1020.03 stated that the Department of Defense "does not tolerate or condone harassment," which it defined as "[b]ehavior that is unwelcome or offensive to a reasonable person . . . that creates an intimidating, hostile, or offensive environment," such as "offensive jokes, epithets, ridicule or mockery, insults or put-downs, displays of offensive objects or imagery, stereotyping," and similar behavior. DODI 1020.03 ¶¶ 1.2(a), 3.1. It also defined sexual harassment to include "deliberate or repeated unwelcome verbal comments or gestures of a sexual nature." *Id.* ¶ 3.3. Article 93 provides for punishment of any servicemember who "is guilty of cruelty toward, or oppression or maltreatment of, any person subject to his orders." 10 U.S.C. § 893.

6

In total, the Investigating Officer took statements from eight witnesses, including the three female servicemembers who had submitted complaints. The first complainant, a Senior Airman, stated that on August 3, 2019, Teacher "inappropriately touched" her as she was attempting to exit the dispatch office of the ramp services building, which made her "feel very uncomfortable and upset." A.R. 54. She also stated that at one point when she was sitting in a truck between Teacher and another male servicemember, Teacher said that she "is sitting in the middle [and] something inappropriate might happen." *Id.* She further stated that Teacher seemed to be "using his rank as an excuse to behave inappropriately," especially toward female servicemembers. *Id.*

A second complainant, another Senior Airman, stated that on August 3, 2019, she saw Teacher "shift his weight forward and rub[] against [the first complainant's] backside (butt)," which "seemed inappropriate." A.R. 52. She also stated that on September 21, 2019, she heard Teacher go on "a rant" about the lesbian, gay, bisexual, transgender, and queer ("LGBTQ") servicemembers' group and remarked that it would be inappropriate to see a particular airman eating a banana. *Id.* She further stated that Teacher told her that "I am going to bang you on your birthday" by giving her a Bang brand energy drink for her birthday, and that he stated that he "drank that pussy juice" when referring to a Pussy brand energy drink. *Id.* She further stated that on some days when she knew she would need to work in the dispatch office with Teacher, she "would mentally prepare [her]self for whatever he was going to talk about that day," but that after he was removed as a result of the investigation, she "already felt better working dispatch." *Id.*

A third complainant, a Staff Sergeant, stated that on August 2, 2019, Teacher jokingly told her not to "look up any explicit things" on the computer and told her that such information was "already on my phone," which made her feel uncomfortable. A.R. 50. She also reported that around August 23, 2019, Teacher remarked that men and women should be allowed to room

7

together, because gay airmen were permitted to share rooms. She further stated that on August 30, 2019, after she commented on a female airman's tattoos, Teacher remarked in front of other servicemembers that he "didn't think [the third complainant] swung that way" and hoped that she did not. *Id.* This comment "aggravated" the third complainant because Teacher "made [her] feel like he would look at [her] differently if he thought [she] was gay." *Id.* She further stated that on September 15, 2019, Teacher said that the Air Force "was better when don't ask don't tell was still in place" and that it was "good" that people did not want to say if they are gay and "that's how it should be." *Id.* This complainant also reported that on September 21, 2019, Teacher said that "they can't have the [LGBTQ] club here," that "it's not right," and that he was going to report that "we need a straight pride group." *Id.* Finally, she asserted that on September 23, 2019, Teacher stated in the presence of the first complainant and four others that "he bangs everyone on their birthday" and that "[i]t doesn't matter black, white, male or female I am going to bang them," after which "[e]veryone felt like he was taking things too far and making things uncomfortable" by "making things about sex and sexual innuendos." A.R. 50–51.

A fourth witness, a Senior Airman, recounted an incident in which he was eating a banana in the dispatch office and Teacher said something like "don't eat that banana around me" because "someone might take it the wrong way." A.R. 205. A fifth witness stated that on September 27, 2019, the witness spoke with someone about "issues that may have occurred in the . . . ramp office" but acknowledged that the witness had not personally heard "any inappropriate comments" by Teacher. A.R. 207. A sixth witness, a Technical Sergeant, stated that, around September 20, 2019, he heard Teacher "do a play with words using Bang energy drinks" by stating that "I am going to Bang you for your birthday." A.R. 68. This witness stated that it "was an inappropriate comment" that Teacher made as a joke "a number of times." *Id.*

8

A seventh witness, a Staff Sergeant, stated that the second complainant had told him that Teacher told her not to eat if she was trying to lose weight and asked for advice on how to handle the situation. This witness also stated that on September 22, 2019, the second complainant said that Teacher had "asked her when her birthday was because he was gonna bang her on her birthday." A.R. 73. This witness accompanied the three complainants to the equal opportunity office when they filed their complaints. An eighth witness, a Technical Sergeant, reported hearing Teacher make "a joke . . . about how he has enough drinks that he will be able to give everyone a Bang for their birthday" and then more specifically state that because he learned the birthday of the second complainant, "he would be able to give her a bang for her birthday." A.R. 71. This witness also stated that "it has seemed like [Teacher] doesn't respect women too much" because he makes comments about "what kind of girls he likes" when watching movies, "[t]o the point where I find myself needing to walk out of the room." *Id.*

On September 29, 2019, the Investigating Officer submitted a Report of Investigation ("the Report") in which he found that Teacher had engaged in inappropriate behavior on 13 occasions on seven dates and concluded that both alleged violations of DODI 1020.03 and Article 93 were substantiated. The Investigating Officer used a preponderance of the evidence standard of proof, pursuant to which he "substantiated a finding only when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." A.R. 180. In reaching his conclusions, the Investigating Officer considered "witness demeanor, opportunity for knowledge, bias, motive, intent, and the ability to recall and relate events," as well as his "own common sense, life experiences and knowledge of the ways of the world to assess the credibility of witnesses interviewed." *Id.*

9

As to the allegation of sexual or other harassment in violation of DODI 1020.03, the Investigating Officer concluded that it was substantiated because at least six servicemembers "either had knowledge of inappropriate (sexual) comments made toward other [airmen] or were targets of inappropriate (sexual) comments," including "statements with sexual connotations directed at other [airmen], inappropriate sexual jokes, and the use of energy beverages to leverage inappropriate comments toward female [airmen] who were under the supervision" of Teacher. A.R. 184. The Investigating Officer found that "because of . . . Teacher's language and use of sexual innuendos, he created a hostile work environment for which he was responsible." A.R. 185. He also found that Teacher "did not ensure his [airmen] were free from discriminatory harassment based on sexual orientation." *Id.* As to the allegation of maltreatment in violation of Article 93, the Investigating Officer found that it was substantiated in part because Teacher "made discriminatory comments based on sexual orientation" and sexual comments toward female airmen, and "discrimination is a form of unlawful harassment and, thus, unlawful maltreatment." A.R. 187.

On September 30, 2019, Lt. Col. Thurman issued to Teacher a "No Contact Order" directing him "not to contact, communicate, or attempt to communicate with any personnel assigned to" the Ramp Operations Section for 30 days. A.R. 137. The order stated that communications between Teacher's counsel and such personnel were permissible.

On October 3, 2019, Teacher, through his counsel, provided written responses to questions posed by the Investigating Officer in which he stated that he "never made sexually explicit remarks or engaged in sexually explicit conversation with" the three complainants, that he "never made any sexual jokes with" them, that he "never made disparaging remarks about LGBTQ people," and that he "never made sexual jokes about energy drinks." A.R. 98. He acknowledged that he

10

"give[s] a Bang energy drink to everyone on their birthday" but asserted that "[t]here was no sexual intent or language" relating to those actions. *Id.*

On October 11, 2019, after reviewing the Report, Lt. Col. Thurman concurred with and approved all of "the findings and conclusions of the investigating officer as to both framed allegations," with the exception of the words "by subjecting one or all of them to discriminatory comments" referenced in the allegation of maltreatment in violation of Article 93. A.R. 237.

### III.    Nonjudicial Punishment

On October 14, 2019, Lt. Col. Thurman informed Teacher in writing that she was considering an NJP under Article 15 and requested a response on whether he would waive his right to a court-martial and accept NJP proceedings. On October 20, 2019, Teacher submitted a responsive memorandum in which he denied making inappropriate physical contact with the first complainant and in which, for each of the alleged harassing comments, Teacher either denied that he made the comment or contested that it constituted a violation. On October 23, 2019, after having received two extensions to respond, Teacher acknowledged that he had consulted an attorney, waived his right to a court-martial, and consented to NJP proceedings.

On October 24, 2019, Lt. Col. Thurman notified Teacher in writing that she had concluded that he had committed the alleged offenses. Specifically, she concluded that his comments directed toward or made in the presence of the three complainants, as well as his leaning into one as she passed him, constituted sexual and other harassment in violation of DODI 1020.03 and maltreatment in violation of Article 93. In addition to formally reprimanding Teacher, Lt. Col. Thurman imposed the punishment of a reduction in rank from Master Sergeant to Technical Sergeant, effective October 24, 2019. Teacher was also sent home early from his deployment.

11

On October 29, 2019, Teacher filed an appeal of the NJP in which he denied making the alleged inappropriate comments, stated that he did not recall details of the incident in which he allegedly touched a complainant but denied that it was inappropriate, questioned the credibility of two of the complainants, and asserted that his due process rights were violated because he had limited time to prepare a defense and because the no-contact order prevented him from gathering evidence with which to rebut the allegations against him. That same day, the appeal was rejected by Lt. Col. Thurman and then by the next superior authority, Colonel Andrew H. Pate.

Before submitting an application to the AFBCMR, Teacher first took other steps to address the NJP. Teacher applied to Lt. Col. Thurman for redress under Article 138 of the UCMJ, which permits a "member of the armed forces who believes himself wronged by his commanding officer" to apply for redress. 10 U.S.C. § 938. On December 23, 2019, she denied his application through a memorandum in which she concluded that his removal from his supervisory position was warranted, that the no-contact order was appropriate and did not prevent his counsel from assisting him, that his challenges to the NJP proceedings were not redressable through Article 138, and that she would not agree to have him rejoin her unit. Teacher also submitted to Colonel Rod T. Grunwald a request to set aside the NJP or, in the alternative, to set aside the reduction in rank, which was denied on January 11, 2020. On January 14, 2020, in a letter in response to an inquiry from a member of Congress on behalf of Teacher, Colonel Rodney L. Simpson stated that, upon review, there was "no fault with the command's administration of military justice" in Teacher's case. A.R. 163.

## IV.    AFBCMR Application

On February 25, 2021, Teacher submitted an application to the AFBCMR in which he requested the removal of the NJP from his Air Force record or, in the alternative, the reversal of

12

his reduction in rank, an award of back pay, the removal of certain allegations from the record, and his reenlistment and assignment to complete the deployment that was curtailed by the NJP. In support of his contention that the NJP constituted "error and injustice," Teacher asserted that most of the allegations were untrue, that there was unlawful command influence, that his due process rights were violated, and that the punishment of a reduction in rank was too severe. A.R. 12.

In a memorandum in support of his application, Teacher argued that the allegations were the result of discontent with his effort to crack down on mistakes and lax standards, and that the three complainants were "good friends" who "got together to fabricate several of the allegations." A.R. 13. He stated that he "did not commit several of the allegations, and those that I admit some responsibility for were taken out of context and overblown." A.R. 14. Teacher asserted that his due process rights were violated because his assigned counsel, who was simultaneously working on a prioritized case at another location, did not have sufficient time to work on his case, and the no-contact order prevented Teacher from gathering evidence on his own. He also asserted a due process violation based on his claim that Lt. Col. Thurman did not provide him with the full Report, a redacted version of which he later obtained through a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and instead "picked and chose" what he could see. A.R. 24. He contended that undisclosed parts of the Report "showed [he] did not make the alleged statements," and that the failure to provide him with that testimony "prevented [him] . . . from exploring evidence that would have proven [his] innocence." A.R. 24. Teacher also criticized the investigation by stating that the Investigating Officer failed to interview certain servicemembers who had "first hand knowledge" of relevant events and who, in statements Teacher attached to his application, vouched for his character or undermined the credibility of the complainants. A.R. 25. Finally, Teacher argued that, where the only potentially accurate claims were those relating to the

statements about Bang energy drinks and eating a banana, the punishment of a reduction in rank was too harsh. Teacher's counsel also submitted a memorandum to the AFBCMR in which he claimed that most of the allegations were "provably untrue," A.R. 30, argued that the conduct did not rise to the level of violations of DODI 1020.03 or Article 93, alleged "unlawful command influence" primarily based on the no-contact order and the appointment of an attorney who was "too busy to help," A.R. 36, and reiterated Teacher's arguments relating to due process and excessive punishment. With these filings, Teacher submitted new evidence, including witness statements from servicemembers who stated that they had not heard the allegedly harassing statements, reported that they were present for certain statements or incidents but did not perceive them to be problematic, noted that the three complainants were friends and that Teacher's efforts to hold servicemembers accountable were not well received, or attested generally to Teacher's good character.

The AFBCMR requested two advisory opinions on Teacher's application. The first, from the Air Force Reserve Command ("AFRC/JAM Advisory Opinion") and dated April 19, 2021, recommended denying Teacher's application based on the conclusion that he was afforded due process in accordance with AFI 51-202 and received a punishment within the range authorized by AFI 51-202. In support of its conclusion, it found that Teacher's commanding officer, Lt. Col. Thurman, "appears to have given full and fair consideration of the evidence, including any matters presented by the member, and found the evidence credible, and that based on the evidence, found the applicant committed the offenses alleged." A.R. 330. It also found that there was "no evidence" of unlawful command influence, and that the no-contact order "did not prevent" Teacher from preparing a defense. A.R. 330. Reviewing the process afforded to Teacher, the AFRC/JAM

14

Advisory Opinion found "no undue delays, errors, or other issues of note," and that his case "appears to have been processed in accordance with AFI 51-202." A.R. 331.

The second advisory opinion, from the Department of the Air Force, Office of the Judge Advocate General ("DAF/JA Advisory Opinion") and dated April 23, 2021, also recommended denial. Based on a review of the record that "defer[red] to the commander's determinations," the DAF/JA Advisory Opinion found "no evidence" of due process violations or unlawful command influence, because Teacher made an informed decision to opt for NJP rather than court-martial, and because where the record contained "ample evidence of misconduct," Teacher's commander did not abuse her discretion in finding that he committed the alleged offenses or in imposing punishment that "was within the permissible range" for the offense and "was not unjust." A.R. 334.

The AFBCMR sent the two advisory opinions to Teacher on November 18, 2021, and he submitted a response to them on December 16, 2021. In his response, Teacher criticized the DAF/JA Advisory Opinion because it "did not conduct a *de novo* review of the facts and deferred to the commander's determination," and thus "does not address the factual assertions" in Teacher's application, and because it incorrectly stated that Teacher did not submit new evidence with his application even though he submitted new statements and interview notes from several individuals. A.R. 336. As for the AFRC/JAM Advisory Opinion, Teacher argued that it was flawed in part because the Investigating Officer's findings, with which the commanding officer concurred, were made under a preponderance of the evidence standard, even though AFI 51-202 states that because proof beyond a reasonable doubt is required during a court-martial, an NJP action is "usually not advisable" in the absence of such proof. A.R. 340–341. He also asserted that the AFRC/JAM Advisory Opinion failed to recognize that the evidence weighed in favor of finding that he did not

15

commit the alleged offenses, that his commanding officer wielded unlawful command influence primarily through the no-contact order, and that his counsel was too busy to provide effective representation to Teacher.

In denying Teacher's application on June 3, 2022, the AFBCMR concluded that "there was insufficient evidence of an error or injustice." A.R. 1. The AFBCMR's Record of Proceedings states the AFBCMR's reasoning and conclusions. After recounting Teacher's contentions, the history of the case, and the applicable legal authorities, the AFBCMR summarized the two advisory opinions and Teacher's responses to them. The AFBCMR then stated that it "concurs with the rationale and recommendations" of the two advisory opinions "and finds [that] a preponderance of the evidence does not substantiate [Teacher's] contentions" that he did not commit most of the alleged acts, that the Investigating Officer was biased, that there was unlawful command influence, that his due process rights were violated, and that his actions did not constitute the violations of which he was accused. A.R. 9. Notably, the AFBCMR "[took] exception" to the claims by Teacher's counsel that Teacher "did not commit most of the allegations and that his comments were taken out of context in an attempt to excuse [his] misconduct." *Id.* Rather, the AFBCMR found that Teacher's "conduct and comments violated Air Force policy on sexual harassment," and that Teacher "failed to uphold the standards expected of Air Force noncommissioned officers." *Id.* It further found that "the investigation was conducted in accordance with regulations," and that Lt. Col. Thurman's issuance of the no-contact order and determinations on the punishment to be imposed "were within the commander's authority and discretion." *Id.* In response to an argument by Teacher's counsel that "it would have been out of character for him to step out of bounds," the AFBCMR "note[d]" that Teacher "also received an Article 15 in May 2010 while deployed to Qatar for violating equal opportunity and treatment

policy and contributing to an intimidating hostile work environment." *Id.* The AFBCMR informed Teacher that he may request reconsideration only if he presents evidence not previously considered during its denial of his original application.

**DISCUSSION**

In the Complaint, Teacher alleges that the AFBCMR's denial of his application violated the APA because it was "arbitrary, capricious, contrary to law, and unsupported by substantial evidence." Compl. at 12, ECF No. 1. He asks the Court to hold unlawful and set aside the denial and to remand the matter to the AFBCMR.

In his Motion for Judgment on the Administrative Record, Teacher argues that the record demonstrates that the AFBCMR's denial was arbitrary and capricious because it improperly "hinged its decision on" and "merely repeated or summarized" the two advisory opinions which themselves contained arbitrary and capricious conclusions, and because it lacked substantial evidence to support its conclusion. Teacher Mot. at 19–20, ECF No. 25-2. Teacher further argues that the AFBCMR denial was "contrary to law" because it "incorrectly stated the standard of proof for NJP" and "improperly relied on a 2010 NJP that was removed from [Teacher's] personnel file and no longer exists." *Id.* at 20. In its Motion, the Air Force argues that the AFBCMR's decision was adequately explained, based on substantial evidence, and did not improperly rely on the 2010 NJP.

## I.    Legal Standards

Under the APA, judicial review of the decisions of a Board for Correction of Military Records "is limited to instances where the Board's judgment was 'arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" *Dorado-Ocasio v. Averill*, 128 F.4th 513, 520 (4th Cir. 2025) (quoting *Downey v. U.S. Dep't of the Army*, 685 F. App'x 184, 189 (4th Cir. 2017));

17

*see* 5 U.S.C. § 706(2)(A), (E). Although the Air Force has entitled its Motion as a Cross Motion for Summary Judgment, for an APA claim, a court does not apply the summary judgment standard pursuant to Federal Rule of Civil Procedure 56 and instead must, in relation to both Motions, "engage in a substantive review of the record" to determine whether "the agency acted arbitrarily or capriciously." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 742–43 (D. Md. 2021) (citations omitted).

When faced with an ordinary arbitrary-and-capricious challenge, "an agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *CASA de Maryland v. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Arbitrary-and-capricious review is "highly deferential, with a presumption in favor of finding the agency action valid," but does not "reduce judicial review to a rubber stamp of agency action." *Id.* (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)). An agency rule or action will be deemed arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

On an APA claim, a Board for Correction of Military Records ("BCMR") is "afforded an unusually deferential application of the arbitrary and capricious standard." *Dorado-Ocasio*, 128 F.4th at 520 (quoting *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)). Rooted in statutory language that grants "significant discretion to military leaders" on whether to

correct military records and consistent with general judicial deference to military decisions, this exceptionally deferential form of review will set aside "only the most egregious decisions" of a BCMR. *Id.* (citation omitted). So long as a BCMR "follows the provisions of relevant law" and the reviewing court can identify in the decision "some explanation providing a discernible path to the Board's determination," then the decision will be upheld. *Id.* at 520, 524. The reviewing court does not "reweigh the evidence presented to the Board, make credibility determinations, or substitute its judgment for that of the agency." *Downey v. U.S. Dep't of the Army*, 685 F. App'x 184, 189 (4th Cir. 2017). Rather, it determines "whether the conclusion being reviewed is supported by substantial evidence." *Id.* at 190 (quoting *Randall v. United States*, 95 F.3d 339, 348 (4th Cir. 1996)). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Platone v. U.S. Dep't of Labor*, 548 F.3d 322, 326 (4th Cir. 2008)).

When adjudicating an APA claim, a court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Here, the certified administrative record includes the AFBCMR denial decision and Record of Proceedings, Teacher's AFBCMR application and exhibits, additional military records, the two advisory opinions, and Teacher's response to them. The administrative record has also been supplemented with documents relating to Teacher's 2010 NJP.

## II.    The AFBCMR Decision

Upon review of the administrative record, the Court concludes that the AFBCMR's decision was not arbitrary and capricious, contrary to law, or unsupported by substantial evidence. As the United States Court of Appeals for the Fourth Circuit has made clear, the AFBCMR need only clear a "low bar." *Dorado-Ocasio*, 128 F.4th at 524. For example, in *Dorado-Ocasio*, the

19

Fourth Circuit upheld a decision of the Army Board for Correction of Military Records ("ABCMR") to deny an application by an Army captain to remove an adverse performance evaluation from her military record based in part on the contentions that it was factually inaccurate, contained unproven derogatory information, and was produced by a rater with a conflict of interest and personal bias. *Id.* at 515, 519. The court so ruled because even though the ABCMR had not provided a lengthy explanation, it analyzed the relevant data, demonstrated an understanding of the incidents at issue, and provided "a discernible path" to its conclusion that there was no basis for correcting the applicant's military records. *Id.* at 524. Similarly, in *Downey*, the Fourth Circuit upheld a decision of the ABCMR to deny an application by an Army lieutenant colonel to remove an NJP finding him guilty of assault from his personnel file because the ABCMR opinion, though not detailed in its explanation, nevertheless summarized the applicant's arguments and evidence, restated the factual findings of the investigation, addressed the applicant's arguments relating to due process violations, and ultimately demonstrated a "rational connection between its factual findings and its conclusion." *Downey*, 685 F. App'x at 187, 190–91.

Here, as in *Dorado-Ocasio* and *Downey*, the record shows that the AFBCMR's denial of Teacher's application and its conclusion that he was "not the victim of an error or injustice" are supported by substantial evidence from which a discernible path to the final result can be identified. A.R. 9. The witness statements provided during the investigation support the conclusion that Teacher "made sexual comments, inappropriate comments" toward subordinate servicemembers and about the LGBTQ community, that he engaged in "inappropriate touch[ing] of airmen under his direct supervision," and that he thereby "created a hostile work environment for those under his supervision." A.R. 4. The fact that Teacher denied that he engaged in many of the acts referenced in the Report, and that he submitted witness statements and other evidence, does not

provide a basis for overturning the AFBCMR decision because in its review, the Court may not reweigh the evidence or engage in credibility determinations. *See Downey*, 685 F. App'x at 190. In any event, upon a review of Teacher's submitted evidence, the Court finds that it does not directly contradict or meaningfully undermine the evidence relied upon in issuing the NJP.

The administrative record further demonstrates that the AFBCMR's decision was not contrary to law as a result of a lack of due process because Teacher received written notification of his rights, A.R. 272, he was represented by counsel, A.R. 64,  the no-contact order did not bar his counsel from speaking with witnesses to prepare a defense, A.R. 137, and he was afforded the opportunity to and in fact did respond to the statements taken from the complainants, A.R. 118–125. Based on the table of penalties, the punishment imposed on Teacher, including the demotion in rank, was within the range permitted by law. A.R. 273; *see* AFI 51-202 ¶ 3.16, tbl. 3.1.

The AFBCMR's written decision demonstrates that the AFBCMR considered the materials submitted by Teacher and Teacher's specific arguments, including that certain allegations were untrue or not credible, that there was unlawful command interference, that his due process rights were violated, and that his punishment was too severe.  In the decision, the AFBCMR described Teacher's specific contentions, recounted specific facts or evidence submitted by Teacher and included such materials as exhibits to its Record of Proceedings, and described the analyses of these arguments in the advisory opinions and concluded that it concurred with those analyses.  In particular, it concluded that Teacher's "conduct and comments violated Air Force policy on sexual harassment," and that there was "no evidence [Teacher] was denied any due process rights or there was any bias against him or that the punishment was unduly harsh or disproportionate." A.R. 9. The AFBCMR's approach was at least as detailed as the analysis upheld in *Downey*, in which the ABCMR's decision consisted largely of a restatement of the factual evidence, a summary of the

applicant's argument, and a statement of the ABCMR's conclusions and was found to have demonstrated "a rational connection between its factual findings and its conclusion." *Downey*, 685 F. App'x at 191. To the extent that the AFBCMR did not expressly respond to all of Teacher's arguments, it "was not required to address in writing every argument raised in [Teacher's application] because the arguments would not have altered the outcome that substantial evidence supported" its conclusion. *Id.* at 190. Thus, as in *Dorado-Ocasio*, the AFBCMR addressed Teacher's claims, "demonstrated an understanding of the incidents" underlying this case, conducted a review of the materials before it, and reached a defensible conclusion that is not the rare, "most egregious" decision that necessitates an exception to "the settled tradition of deference to professional military judgments." *Dorado-Ocasio*, 128 F.4th at 520, 524. Therefore, the AFBCMR's decision was not arbitrary and capricious.

Teacher makes three more specific arguments that the AFBCMR's decision nevertheless violated the APA. First, he argues that the AFBCMR decision was arbitrary and capricious because it relied on the two advisory opinions, which were themselves arbitrary and capricious because, in Teacher's view, they did not engage sufficiently with his arguments relating to alleged due process violations or with the new evidence he presented to the AFBCMR. However, the AFBCMR is expressly permitted by regulation to seek such advisory opinions. *See* 32 C.F.R. §§ 865.2(c), 865.4(a)(1). As Teacher has acknowledged, the AFBCMR may rely on such opinions to supply the reasoning for its conclusions. *See Roberts v. United States*, 741 F.3d 152, 158–59 (D.C. Cir. 2014). In *Roberts*, the court explicitly stated that to meet the requirement of providing a "reasoned explanation" for its decision, a BCMR "may meet this obligation by referring the reader to 'clearly relevant sources other than a formal statement of reasons,'" and that it had previously "looked . . . to the reasoning of an advisory opinion in upholding a decision" of such a

BCMR. *Id.* at 159. Although Teacher nevertheless argues that a BCMR may not rest its decision on an advisory opinion that itself is arbitrary and capricious, the only example he has provided of such a scenario is *McDonough v. Stackley*, 245 F. Supp. 3d 1 (D.D.C. 2017), in which the Board for Correction of Naval Records was found to have acted arbitrarily and capriciously when it "essentially rest[ed]" its decision on an advisory opinion that was flawed in that it evaluated the wrong filing by the applicant containing a different set of objections, such that the court lacked "any confidence that the [advisory] opinion's author laid eyes on, let alone evaluated" the applicant's filing. *Id.* at 5, 7. Here, in contrast, both advisory opinions readily demonstrate awareness of and engagement with the arguments made in Teacher's application to the AFBCMR, including those relating to untrue allegations, unlawful command influence, lack of due process, and the severity of the punishment. Where there were no irregularities in the advisory opinions that rendered them unreliable, and the AFBCMR could properly rely on them, the Court rejects Teacher's argument relating to the advisory opinions and finds that neither the advisory opinions nor the AFBCMR decision were arbitrary and capricious on this basis.

Teacher next argues that the AFBCMR acted contrary to law when it concurred with the AFRC/JAM Advisory Opinion because that opinion "endorsed the incorrect standard of proof" for an NJP as proof by a preponderance of the evidence rather than proof beyond a reasonable doubt. Teacher Mot. at 25. However, although the AFRC/JAM Advisory Opinion noted that the Investigating Officer made findings and conclusions based on a preponderance of the evidence standard, and that Lt. Col. Thurman had concurred with those findings and conclusions, it correctly stated that, under the then-applicable version of AFI 51-202, there was "no specific standard of proof that applies to [NJP]" while acknowledging that the court-martial standard is proof beyond a reasonable doubt. A.R. 330 (citing AFI 51-202 ¶ 3.4). Lt. Col. Thurman and those reviewing

23

her decisions were therefore permitted to use a preponderance of the evidence standard. Notably, the more recent version of AFI 51-202, while not applicable here, specifically provides that the standard of proof when imposing NJP and on appeal is a preponderance of the evidence. *See* AFI 51-202 ¶ 3.4 (Jan. 4, 2022).

Although AFI 51-202 also stated that because "a member is entitled to demand trial by court-martial, in which case proof beyond a reasonable doubt of each element of every offense by legal and competent evidence is a prerequisite to conviction," "NJP action is usually not advisable" without such proof, this prudential consideration is not a legally mandated standard of proof. AFI 51-202 ¶ 3.4. Had Teacher wanted to insist on proof beyond a reasonable doubt, he could have chosen to proceed by court-martial, but he knowingly waived his right to do so when he accepted NJP proceedings. Thus, the AFBCMR's decision did not misstate the standard of proof for an NJP and was not contrary to law on that basis.

Finally, Teacher argues that the AFBCMR "improperly relied on the 2010 NJP" because it is "nonexistent" in that it is "no longer in [his] personnel file," and that in doing so it "improperly conducted ex parte communications with third parties without providing [him] with a copy of the correspondence and/or communications" about the 2010 NJP. Teacher Mot. at 25–26. Although the 2010 NJP was not submitted to the AFBCMR by Teacher, the AFBCMR included it with the Record of Proceedings in an exhibit consisting of "[d]ocumentary evidence, including relevant excerpts from official records." A.R. ii, 266–269. By regulation, the AFBCMR is permitted to "get additional information . . . on an application from any Air Force organization or official." 32 C.F.R. § 865.4(a)(1). As for the claim that the 2010 NJP is nonexistent because it is no longer in Teacher's personnel file, Teacher's basis for this allegation is the fact that he submitted a request under FOIA for documents relating to the 2010 NJP, but he did not receive the record in response

24

to that request. Regardless of the reason that the FOIA request did not result in the production of the 2010 NJP document to him, at no point has Teacher claimed or established that the 2010 NJP never occurred, that the 2010 NJP document included in the record by the AFBCMR is not authentic, or that the NJP was overturned, vacated, or otherwise no longer legally valid. Indeed, the presence of Teacher's signature on the 2010 NJP document demonstrates that the proceeding occurred, that Teacher received notice of the NJP, and that he filed an appeal of the decision, which was granted to the extent that the language of Teacher's reprimand was modified and was otherwise denied.

As for whether the failure of the AFBCMR to provide a copy of the NJP to Teacher prior to its ruling was contrary to law, applicable statutory and regulatory provisions generally require that applicants be provided with copies of correspondence between the AFBCMR and other entities and be afforded the opportunity to comment on them.  10 U.S.C. § 1556(a); 32 C.F.R. § 865.4(b).  These requirements, however, do not apply to Teacher's 2010 NJP because it is a record that was previously provided to him in 2010, as established by his signature on the document.  *See* 10 U.S.C. § 1556(b)(3), (5); AFI 36-2603 ¶ 4.3 (Sept. 18, 2017).

In any event, the Court finds that Teacher's arguments relating to the 2010 NJP do not provide a basis to overturn the AFBCMR decision because the 2010 NJP was collateral to the AFBCMR's decision.  First, as Teacher acknowledges, his commanding officer did not rely on it in issuing the 2019 NJP, and it was not considered or addressed at any stage of the review process prior to the AFBCMR's decision.  Second, in its decision, the AFBCMR made no reference to the 2010 NJP as part of its assessment of the evidence in the record and the determinations made by Teacher's commanding officer and the more senior officers who reviewed the NJP on appeal.  Rather, the AFBCMR referenced the 2010 NJP only in response to a tangential argument by

25

Teacher's counsel that Teacher had never before been in trouble and it would therefore be "out of character for him to step out of bounds" by "not[ing]" that Teacher "also received an Article 15 in May 2010 while deployed to Qatar for violating equal opportunity and treatment policy and contributing to an intimidating hostile work environment." A.R. 9. On this record, the Court finds that the 2010 NJP was not a necessary part of the AFBCMR's decision, which was based on substantial evidence separate and apart from the 2010 NJP. Where Teacher has the burden to show that an alleged error relating to the 2010 NJP was prejudicial to his case, the Court finds that any such error "did not affect the outcome" of the AFBCMR's decision on the merits of Teacher's application and therefore does not provide a basis to overturn that decision. *See Downey*, 685 F. App'x at 191 n.6 (quoting *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016)).

Because the AFBCMR's decision was based on substantial evidence and contained "a discernable path" to its conclusion, *Dorado-Ocasio*, 128 F.4th at 515, 524, and because Teacher's arguments relating to the advisory opinions, the standard of proof, and the 2010 NJP are unavailing, the Court concludes that the AFBCMR's denial of Teacher's application to correct his military records did not violate the APA.

## CONCLUSION

For the foregoing reasons, Teacher's Motion for Judgment on the Administrative Record will be DENIED, and the Air Force's Cross Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date:  January 30, 2026

THEODORE D. CHUANG
United States District Judge